ROSALIE LINDSAY-GUIMARÃES (Bar No. 11003)
LAURA HENRIE (Bar No. 12449)
**DISABILITY LAW CENTER**
205 North 400 West
Salt Lake City, Utah 84103
Phone: 801.363.1347
Fax:     801.363.1437
Email: rguimaraes@disabilitylawcenter.org
         lhenrie@disabilitylawcenter.org

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
NORTHERN DIVISION**

| | |
|---|---|
| **ARACELI PAREDES,**<br><br>Plaintiff,<br><br>v.<br><br>**AUTOLIV ASP, INC.,**<br><br>Defendant. | Civil Case No. 1:20-cv-00001-EJF<br><br>**COMPLAINT**<br><br>**(JURY DEMANDED)**<br><br>Judge Evelyn J. Furse |

Plaintiff, Araceli Paredes ("Ms. Paredes or "Plaintiff"), by and through her undersigned attorneys, hereby complains and alleges against Defendant, Autoliv ASP, Inc. ("Autoliv" or "Defendant"), as follows:

### I.   NATURE OF THE CLAIMS

1. This is a disability discrimination action brought by Plaintiff under the Americans with Disabilities Amendments Act of 2008 ("ADA"), codified at 42 U.S.C. §§ 12101 *et seq*.

2. Plaintiff seeks injunctive relief, equitable relief, punitive damages, and monetary relief as compensation for Defendant's violations of her rights under the ADA pursuant to 42 U.S.C. § 12188, and attorney fees and costs pursuant to 42 U.S.C. § 12205.

## II.   PARTIES

3. Defendant is an international corporation organized under the laws of the State of Indiana, with its international headquarters in Stockholm, Sweden. Defendant operates a manufacturing facility in Ogden, Utah.

4. Defendant is a corporation that employs more than fifteen employees.

5. Plaintiff is an individual residing in the State of Utah, Weber County, and at all times relevant to the allegations in this Complaint worked for Defendant at its manufacturing facility located at 1000 West 3300 South, Ogden, Utah 84401.

6. Plaintiff was diagnosed with cancer while employed with Defendant. Cancer is a physical or mental impairment that substantially limits several of Plaintiff's major life activities, including, but not limited to, the operation of major bodily functions such as normal cell growth and functions of the immune system.

## III.   JURISDICTION AND VENUE

7. On about June 25, 2018, Plaintiff filed a Charge of Discrimination with the Utah Antidiscrimination and Labor Division of the Utah Labor Commission ("UALD"), alleging discrimination based on disability for Defendant's termination of her employment. The UALD perfected the charge on August 23, 2018.

8. On about March 26, 2019, the UALD issued a Determination and Order finding no reasonable cause and dismissing the Charge of Discrimination.

9. On approximately April 9, 2019, Plaintiff submitted a request for a substantial weight review to the United States Equal Employment Opportunity Commission ("EEOC").

10. On about October 7, 2019, the EEOC issued a Dismissal and Notice of Rights ("Right to Sue notice") in which it indicated that no further action would be taken by the EEOC.[1]

11. Plaintiff has exhausted all available administrative remedies and now seeks relief in federal court.

12. This Court has jurisdiction to hear and decide Plaintiff's civil claims pursuant to 28 U.S.C. § 1331 and the ADA, 42 U.S.C. §§ 12101-12213. This Court has personal jurisdiction over Defendant because Defendant conducts business in the State of Utah.

13. Pursuant to 28 U.S.C. § 1391(b), this Court is the proper venue because all the employment practices alleged to be unlawful were committed within the jurisdiction of the Northern Division of the District of Utah.

### IV. FACTUAL BACKGROUND

14. Ms. Paredes was diagnosed with breast cancer while employed with Defendant. Cancer is a physical or mental impairment that substantially limits several of Plaintiff's major life activities, including, but not limited to, the operation of major bodily functions such as normal cell growth and functions of the immune system.

15. Defendant is an international company that supplies automotive safety systems and products. It operates a manufacturing facility in Ogden, Utah.

---

[1] The EEOC's original Right to Sue notice, which counsel for Plaintiff received on approximately October 10, 2019, provided the erroneous date of October 7, 2018. The EEOC subsequently issued a corrected Right to Sue notice with the date of October 7, 2019, which counsel for Plaintiff received on approximately October 21, 2019. *See* EEOC Right to Sue notice of October 7, 2019, attached hereto as Exhibit A.

16. Ms. Paredes began working for Defendant in the production department of its manufacturing facility in Ogden, Utah, on approximately February 6, 1998.

17. During Ms. Paredes' approximately twenty years working for Defendant, she never had performance issues and was a hard-working, reliable employee.

18. In early 2017, Ms. Paredes injured her shoulder on the job and underwent shoulder surgery.

19. Following Ms. Paredes' shoulder surgery, she used twelve weeks of unpaid medical leave under the Family and Medical Leave Act of 1993 ("FMLA") for her recovery. In addition, Ms. Paredes was approved for an additional twenty-three weeks of short-term disability insurance benefits during her recovery period.

20. In approximately mid-February 2018, Ms. Paredes was diagnosed with breast cancer.

21. Ms. Paredes' medical providers informed her that she needed prompt surgery to treat the cancer.

22. Because Ms. Paredes had used her available short-term disability insurance benefits in connection with her 2017 shoulder injury, she asked Defendant whether she had any medical leave options for the recovery period that would follow her breast cancer surgery.

23. In response to Ms. Paredes' inquiry regarding available medical leave options for her impending surgery, Defendant did not advise Ms. Paredes of the possibility of requesting additional medical leave as an ADA accommodation.

24. Defendant instead advised Ms. Paredes that she would qualify for additional short-term disability insurance benefits in the beginning of March 2018.

25. In reliance on Defendant's representation regarding her qualification for additional short-term disability insurance benefits, Ms. Paredes scheduled her breast cancer surgery for March 8, 2018.

26. Ms. Paredes was subsequently advised by Aetna, Defendant's benefits administrator, that she was approved for four weeks of short-term disability leave through March 27, 2018, with the final week being unpaid.

27. Ms. Paredes had breast cancer surgery on March 8, 2018, as scheduled.

28. After Ms. Paredes' breast cancer surgery, she was advised by her medical provider that she would require periodic chemotherapy treatments for several months to further treat the cancer.

29. Because Ms. Paredes had already been advised that her short-term disability insurance benefits would extend only to March 27, 2019, and because Defendant had not informed Ms. Paredes that additional leave under the ADA was a possibility, Ms. Paredes believed that she had no other option at that point but to apply for long-term disability benefits to cover the expected term of her periodic chemotherapy treatments.

30. In response to Ms. Paredes' application for long-term disability benefits, Aetna required that a form called an Attending Provider Statement be filled out by Ms. Paredes' medical provider in order to obtain information regarding Ms. Paredes' medical condition.

31. Ms. Paredes met with her oncologist on March 29, 2018, and her oncologist filled out the Attending Provider Statement the same day.

32. Question 1 on the Attending Provider Statement asked for the patient's primary diagnosis. Ms. Paredes' oncologist identified breast cancer as her primary diagnosis.

33. Question 11 on the Attending Provider Statement asked, "What specific physical, cognitive or behavioral activity/function is the patient unable to do?" Ms. Paredes' oncologist responded: "Patient will not be able to lift, stand for long periods at a time. Fatigue, nausea, vomiting etc. may occur while undergoing chemotherapy normal activity may be limited."[2]

34. Question 12 on the Attending Provider Statement asked, "What specific physical, cognitive or behavioral activity/function, related to the conditions you are managing, can the patient still do?" Ms. Paredes' oncologist responded: "patient is still able to walk for minimal amounts of time while undergoing chemotherapy patient is still able to do her daily home functions. During chemotherapy normal activity may be limited."[3]

35. Question 14 on the Attending Provider Statement asked, "If the patient is likely to have a full recovery, what date/timeframe would that be?" Ms. Paredes' oncologist responded: "Expect full recovery."

36. Question 15 on the Attending Provider Statement asked, "What date/timeframe would you expect to see some improvement in the patient's ability to function?" Ms. Paredes' oncologist responded: "8 months from date p[atien]t begins treatment."

37. Consistent with the answer to Question 11 on the Attending Provider Statement, Ms. Paredes' oncologist informed her during the doctor visit on March 29, 2018, that Ms. Paredes could expect to experience side effects of nausea, vomiting, and fatigue with each round of weekly or biweekly chemotherapy.

---

[2] This medical provider response is punctuated as it appears on the Attending Provider Statement.
[3] This medical provider response is punctuated as it appears on the Attending Provider Statement.

38. Ms. Paredes' oncologist also explained during the March 29, 2018, doctor visit that she could expect to experience the side effects most acutely during the first few days following a round of chemotherapy, such that her normal activity would be limited during those first few days after a treatment.

39. Ms. Paredes' oncologist explained during the same visit that Ms. Paredes could expect to feel significantly better after the first few days of acute side effects and that her ability to function at more normal levels would increase.

40. Encouraged by the oncologist's description of what to expect from the treatments, Ms. Paredes asked her oncologist whether she could continue to work while undergoing chemotherapy treatments.

41. Ms. Paredes' oncologist advised her that she could work as tolerated between chemotherapy treatments on the days when she was not experiencing the limitations of the acute fatigue and other side effects.

42. Ms. Paredes' oncologist explained that some cancer patients have a chemotherapy treatment and are well enough to work the following day. The oncologist emphasized that Ms. Paredes would need to gauge her individual reaction to the treatments in determining how quickly and to what extent she should return to work after each treatment.

43. The information Ms. Paredes received from her oncologist during the March 29, 2018, doctor visit is consistent with the oncologist's answers on the Attending Provider Statement that "during chemotherapy" her normal activity "may be limited."

44. The instructions from Ms. Paredes' oncologist that she could work as tolerated between treatments is also consistent with the Attending Provider Statement, which does not state that Ms. Paredes would not be able to work at all after she began the treatments.

45. In April 2018, during the weeks following Ms. Paredes' March 29, 2018, doctor appointment, Ms. Paredes spoke at various times with Lisa Williams and Jennifer Hummel in Defendant's human resources department to ask what options she had for maintaining her employment while undergoing the treatments.

46. Ms. Paredes was advised that she had exhausted her medical leave options. Neither Ms. Williams nor Ms. Hummel mentioned additional ADA leave as a possibility.

47. Ms. Paredes asked if anything could be done to keep her job of twenty years. She explained to Ms. Williams and Ms. Hummel that her oncologist had authorized her to work part-time between treatments, as tolerated.

48. Ms. Paredes therefore asked that she be permitted to take Fridays off for her treatments so that she could experience the most acute side effects over the weekend and be able to work again between Monday and Thursday.

49. Ms. Paredes also suggested that she could work the proposed part-time schedule in a different role while she underwent the periodic chemotherapy treatments.

50. Ms. Paredes believed that her request was reasonable based in part on past experiences when she and other employees had been permitted at times of illness to temporarily work at other lighter-duty positions.

51. Ms. Williams advised Ms. Paredes that Defendant would only allow her to return to work if she were well enough to work a full-time schedule.

52. Ms. Williams stated that there were no other positions to which Ms. Paredes could be reassigned during the term of her periodic chemotherapy treatments.

53. Ms. Williams also informed Ms. Paredes that under the circumstances, her employment would have to be terminated, but that Ms. Paredes could reapply for a position when she was able to return in a full-time capacity.

54. On at least two occasions when Ms. Paredes spoke with Ms. Williams or Ms. Hummel in April 2018, Ms. Paredes' daughter, Jennifer Paredes, was present to assist with language interpretation and provide support.

55. For example, Ms. Paredes' daughter was present when Ms. Paredes requested accommodations such as a part-time schedule to accommodate her periodic treatments or reassignment to a different position during the term of her treatments.

56. Ms. Paredes' daughter was also present when Ms. Paredes explained that her oncologist had agreed that she could continue to work as tolerated while undergoing chemotherapy.

57. At no time during any of Ms. Paredes' conversations with Ms. Williams or Ms. Hummel, including the conversations when Ms. Paredes' daughter was present, were Ms. Paredes' options under the ADA discussed or explored.

58. Rather, Ms. Williams and Ms. Hummel only evaluated Ms. Paredes' situation in terms of leave under the FMLA or with respect to short-term or long-term disability insurance benefits. At no time did either Ms. Williams or Ms. Hummel discuss accommodations under the ADA.

59. On April 15, 2018, an Aetna representative responded via email to Ms. Williams, confirming that Aetna had only approved short-term disability benefits for Ms. Paredes through March 27, 2018, and that the long-term disability leave request had been denied for lack of eligibility.

60. The Aetna representative informed Ms. Williams that the most recent information Aetna had received from Ms. Paredes' medical provider "has her out at least 8 more months."

61. Around the same time, Defendant's human resources representative, Jennifer Hummel, sent Ms. Paredes a letter explaining Ms. Paredes' ineligibility for further short-term disability benefits. Ms. Hummel ended the letter by adding: "The information we were provided also indicated that you were unable to return to work until roughly 8 months from now."

62. Upon learning of the denial of additional disability benefits, Ms. Paredes spoke again with Ms. Williams and Ms. Hummel and explained that she had not been asking for eight months of continuous leave when she requested accommodations.

63. However, Ms. Williams informed Ms. Paredes that if she was concerned about how Aetna had interpreted her leave request, she should call Aetna to clarify the matter. Ms. Williams refused to engage further with Ms. Paredes to clarify the nature of her accommodation request where any clarification may have been needed.

64. In spite of Ms. Paredes' repeated requests to continue working during her treatments with an accommodation such as a part-time schedule or reassignment, Ms. Williams and Ms. Hummel treated Ms. Paredes' accommodation request as a request for eight months of continuous leave.

65. Ms. Williams and Ms. Hummel never attempted to obtain clarification from Ms. Paredes' oncologist regarding her ability to work or recommended accommodations that might enable Ms. Paredes to continue working during her treatments.

66. When Ms. Paredes reiterated her request for accommodations and emphasized that she was not asking for eight months of additional leave, Ms. Paredes' daughter was present on at least one occasion when Ms. Paredes was told to take up the issue with Aetna.

67. Ms. Paredes subsequently attempted to speak to Aetna regarding its apparent assumption that she had requested eight months of continuous leave in spite of her oncologist's statements to her that she could work as tolerated, and in spite of her own repeated statements that she wished to continue working. Ms. Paredes was unsuccessful in her attempts to communicate with anyone at Aetna who could help resolve the issue.

68. On April 20, 2018, Ms. Williams sent Ms. Paredes a letter terminating her employment. Ms. Williams stated that Ms. Paredes' involuntary termination was due to "Medical-Non Work Related."

69. At no time prior to Ms. Paredes' termination did Defendant engage in the required good faith interactive process to explore possible ADA accommodations that would enable Ms. Paredes to continue working during her term of periodic chemotherapy treatments.

70. As a direct result of Defendant's failure to accommodate Ms. Paredes and its termination of her employment, Ms. Paredes has suffered financial losses and emotional distress.

## FIRST CLAIM FOR RELIEF

*Disability Discrimination (Failure to Provide Reasonable Accommodations)
in Violation of the ADA*

Plaintiff incorporates herein by reference all allegations made in previous paragraphs, and further alleges as follows:

71. Ms. Paredes is a person with a disability as defined by the ADA.

72. Ms. Paredes was qualified, with or without reasonable accommodations, to perform the essential functions of her position.

73. Ms. Paredes requested plausibly reasonable and effective accommodations, including a modified work schedule and reassignment to another position while she underwent periodic chemotherapy treatments.

74. Defendant failed to engage in good faith in the required interactive process to explore ways that Ms. Paredes might be accommodated while undergoing periodic chemotherapy treatments.

75. Defendant refused to provide Ms. Paredes with the reasonable accommodations she requested and failed to provide her with other reasonable accommodations Defendant could have proposed by engaging in good faith in the interactive process.

76. Defendant's failure to accommodate Ms. Paredes includes, but is not limited to, its refusal to provide Ms. Paredes with a temporary modified work schedule, a reasonable amount of additional intermittent medical leave under the ADA, or temporary reassignment to another position.

77. Ms. Paredes suffered adverse employment actions as a direct result of Defendant's failure to provide reasonable accommodations, including, but not limited to, lost wages and the termination of her employment.

## SECOND CLAIM FOR RELIEF

*Disability Discrimination (Wrongful Termination) in Violation of the ADA*

Plaintiff incorporates herein by reference all allegations made in previous paragraphs, and further alleges as follows:

78. Ms. Paredes is a person with a disability as defined by the ADA.

79. Ms. Paredes was qualified, with or without reasonable accommodations, to perform the essential function of her position.

80. Defendant terminated Ms. Paredes' employment because of her disability when it refused to provide accommodations during her period of chemotherapy treatments and advised Ms. Paredes that she could not maintain her employment unless she was fully healed and working her regular full-time schedule in her usual position.

## PRAYER FOR RELIEF

WHEREFORE, these premises considered, Plaintiff ARACELI PAREDES respectfully requests that this Honorable Court:

A. Enter a permanent injunction enjoining Defendant from engaging in employment practices that discriminate based on disability;

B. Enter an order requiring Defendant to make Ms. Paredes whole by placing her in the position she would have occupied in the absence of discrimination, including back pay, front pay, interest, and other benefits that would have accrued;

      C.      Enter an order requiring Defendant to pay compensatory and punitive damages as a jury may assess;

      D.      Award Ms. Paredes her reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 12205; and

      E.      Award such other and further relief as justice may require.

## DEMAND FOR JURY TRIAL

Ms. Paredes hereby requests a jury trial.

RESPECTFULLY SUBMITTED on this, the 6th day of January 2020.

                                                          By:    */s/ Rosalie Lindsay-Guimarães*
                                                                        ROSALIE LINDSAY-GUIMARÃES
                                                                        LAURA HENRIE
                                                                        **DISABILITY LAW CENTER**

                                                                        *Attorneys for Plaintiff*